Filed 12/26/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| APRIL D. MYRES,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>BOARD OF ADMINISTRATION FOR PUBLIC EMPLOYEES' RETIREMENT SYSTEM,<br><br>　　　Defendant and Respondent. | A170516<br><br>(City and County of San Francisco Super. Ct. No. CPF-23-518202) |

　　　In 2012, as part of the Public Employees Pension Reform Act (PEPRA; Gov. Code[1], § 7522 et seq.; Stats. 2012, ch. 296, § 15), the Legislature enacted section 7522.72, under which a public employee forfeits part of their pension upon conviction of a felony "for conduct arising out of or in the performance of [their] official duties." (§ 7522.72, subd (b)(1) (hereafter § 7522.72(b)(1)).) This appeal presents a question of first impression about the scope of that phrase. The Public Employees Retirement System (CalPERS) decided that it encompassed the conduct for which a federal jury found former San Francisco Deputy Sheriff April Myres guilty of mail and wire fraud (18 U.S.C. §§ 1341, 1343). The trial court denied Myres's petition for a writ of administrative mandate. We agree with her that, while her criminal conduct related in some ways to her position, it did not "aris[e] out of or in the performance of . . . her official duties" (§ 7522.72(b)(1)). We reject CalPERS's expansive view that, to

---

[1] All undesignated statutory citations are to the Government Code.

satisfy that standard, conduct need only be "job related." That view ignores the statute's text and has no support in precedent. We reverse.

## BACKGROUND

Myres served for nearly 20 years as a deputy in the San Francisco Sheriff's Office (SFSO). She worked mainly as a jail guard and often volunteered to work overtime for extra pay she spent, in no small part, on designer footwear, clothing, and bags.

Myres's legal troubles began in 2014 when, in knowing violation of SFSO policy, she began having—and concealing—a romantic relationship with Antoine Fowler, an inmate she was charged with guarding. In August 2015, the SFSO told Myres it was investigating her and transferred her to a post outside the jail.

When Fowler was released from jail in January 2016, FBI agents surveilled him as he went to Myres's San Francisco home, where for the next two months he either lived or repeatedly spent the night. (All dates below are in 2016 until otherwise specified.) Fowler's relationship with Myres was stormy, punctuated by harsh fights and reconciliations, threats by Fowler to expose the relationship and thus imperil Myres's job, and bitter comments by Myres about looking forward to Fowler suffering violent retribution as a known snitch.

On the night of March 23, Myres and Fowler had a final fight; then or in the morning of March 24, they broke up. At Myres's criminal trial, the prosecution was unable to produce evidence of her having had any contact with Fowler after the morning of March 24; CalPERS does not claim she did.

On the night of March 24, Myres slept at her sister's house, and Fowler took revenge for the breakup by ransacking and burglarizing Myres's house. He stole the pistol and handheld radio the SFSO had issued Myres when she

2

began work as a deputy; other work gear; and dozens of luxury personal items—footwear, purses, furs, and jewelry—Myres had obtained as gifts or with her overtime pay. The next day, Fowler texted photos of some of the items to people he hoped could help sell them.

When Myres got home on the morning of March 25, she discovered the burglary and called the police. She did not tell the responding San Francisco Police Department (SFPD) officers about the bitter breakup that had so closely preceded the burglary or otherwise disclose her involvement with a recently released felon who was familiar with her house. The FBI also investigated the burglary.[2]

Two weeks later, the SFSO issued Myres a new gun and radio, without charge. Four weeks after that, on May 4, Myres mailed a claim and Proof of Loss form (PoL) to Farmers Insurance Company (Farmers), seeking payment under her homeowners policy for 43 assertedly stolen items with a stated aggregate value of about $66,000. Among the items listed as stolen personal property were her SFSO-issued gun and hand radio (which she claimed to have bought, specifying vendors, years, and prices) and 3 luxury items (a purse, fur vest, and designer boots) that authorities would later find in her house.

Farmers rejected the PoL and told Myres it needed more information, including the identity of her direct supervisor. She modified the PoL to identify Captain Lisette Adams as her direct supervisor and added a cover note stating, "Per S.F. city charter all equipment is mine[] after 4 years of

---

[2] CalPERS has noted evidence that FBI agents asked permission to take fingerprints at Myres's home, and she refused. But the federal court excluded all such evidence from her criminal trial, so it cannot be part of the conduct "for" which she was convicted. (See § 7522.72(b)(1) [applicable to conviction "for conduct [of specified type]"].)

service. I am a 20 year veteran of the SFS[O]. Can confirm with direct supervisor." Myres wrote the note on an SFSO fax cover sheet and used an SFSO fax machine to send Farmers the amended PoL. (At the time, Myres asserts without dispute, her home fax machine was broken.)

Neither the San Francisco City Charter nor SFSO policy in fact causes SFSO-issued gear to become a deputy's property after any amount of service. Captain Adams, a friend of Myres's, was never her direct supervisor (though she was a superior in her chain of command) and, when Myres faxed the PoL, had been on disability leave for a year. At some time after the burglary, Adams spoke with Myres about her insurance claim and told Myres that, while researching an issue in her role as a union representative, she had come across a provision in the city charter that she recalled as saying that, after some period, city employees came to own their equipment—though that issue had not been the focus of her research, and she could not send Myres the provision.

Suspicious of Myres's claim, Farmers began a multi-stage investigation. Eventually, Myres underwent an "examination under oath" conducted by an attorney and transcribed by a reporter, at which she acknowledged that she did not own the gun or radio, but answered "no" when asked if she had any " 'begrudged ex-boyfriends or ex-husbands you think could have been involved in this incident.' "

The FBI, which was communicating with Farmers, came to suspect that Myres and Fowler had staged the burglary to enable Myres both to file a false insurance claim and to covertly give Fowler her weapon so that he, as a snitch, could protect himself. That theory fell apart at Myres's criminal trial—at which the jury acquitted her on the lone count based on the theory—and CalPERS makes no such allegation here. But in January 2017, federal

4

prosecutors filed a criminal complaint jointly charging Myres and Fowler with committing and conspiring to commit mail and wire fraud (for the insurance claim), to which the government soon added a charge that Myres gave a felon a firearm (18 U.S.C. § 922(d)).

In February 2017, the FBI simultaneously executed warrants to arrest Myres and search Fowler. During the search, FBI agents found Myres's gun in Fowler's car, subjecting him to arrest as a felon in possession of a firearm (18 U.S.C. § 922(g)(1)). Other agents, searching Myres's home for the 43 items listed in her insurance claim, found 3 of them (a purse, fur vest, and pair of boots).

Federal agents arrested Myres, who retired from the SFSO. In April 2017, a federal grand jury indicted her for mail and wire fraud, based on having mailed and faxed material to Farmers about her claim, and, in lieu of the former charge of giving a felon a firearm, a count for misprision of a felony (18 U.S.C. § 4). That crime comprises knowing that someone has committed a federal felony, failing to report it, and taking action to deliberately conceal it. The felony the indictment charged Myres with misprising was Fowler's unlawful possession of a firearm as a felon (18 U.S.C. § 922(g)(1)).

At Myres's trial, prosecutors proved unable to substantiate their theory that she had staged a fake burglary with Fowler, and they all but conceded that he had truly burgled her home in revenge for the breakup. The jury acquitted Myres of misprision but found her guilty of mail and wire fraud. (When jurors spoke with counsel afterward—according to testimony in this proceeding by Myres's criminal counsel—they said they had convicted her based on her false claims for the three luxury items (the purse, vest, and boots).)

5

In sentencing proceedings, the prosecution urged the court to adjust Myres's sentence upward based on a federal sentencing guideline applicable to defendants who "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." (U.S.S.G. § 3B1.3.) The probation office rejected the suggestion, and the court agreed, stating that it was a "close call," but the "crimes for which [Myres] was actually convicted did not involve an abuse of a position of trust that significantly facilitated the offense."

At the sentencing hearing, Myres's counsel argued that her career of public service mitigated her crimes, while deeming the case a small, failed insurance fraud that would never have been tried in federal court—and subject to strict federal sentencing guidelines—"absent the allegation[] that she had given her [SFSO]-issued gun to a felon, which proved to be untrue." Rejecting the idea that the failed gun charge was "the only reason this case is here," the court interjected, "That and because she abused her trust as a sworn law enforcement officer[,] which makes it a different case," adding, "When a sworn law enforcement officer engages in fraudulent conduct and abuses her trust, that is a significant matter." The court then endorsed this passage from the presentence report: "It cannot be [over]stated that [Myres] was a Sheriff's Deputy at the time of the . . . offense[s]. One cannot separate her job in law enforcement from her conduct. She was trusted by the [SFSO] and by her community, . . . which she had taken an oath to protect. [¶] [Her] career is not a mitigating factor . . . [.] [W]ith a successful career as a Sheriff's Deputy[, she] should have known better, when those sworn to uphold the law become the very ones who break the law, the entire criminal justice system is undermined."

6

The court imposed a midrange sentence of 14 months. The Ninth Circuit Court of Appeals affirmed Myres's conviction but vacated her sentence, remanding for the trial court to explain how it had determined the amount of loss she intended her fraud to cause (which, under the sentencing guidelines, dictated the length of her sentence). (*United States v. Myres* (9th Cir. 2021) 844 Fed.Appx. 987, 990–91.) On remand, the court sentenced Myres to time served and three years of supervised release.

After Myres's convictions were affirmed, CalPERS concluded that they "ar[ose] out of . . . the performance of [her] official duties," triggering section 7522.72. CalPERS informed her that she had thereby forfeited that part of her pension attributable to her last nine and a half months of service—from the day she sent Farmers her false claim through the day she retired. Myres requested a hearing before an administrative law judge (ALJ).

After an evidentiary hearing, an ALJ issued a proposed decision that upheld CalPERS's decision. Noting that an element of Myres's crimes was forming a scheme to defraud her victim (18 U.S.C., §§ 1341, 1343), the ALJ reasoned that her "scheme to defraud her insurer" included her "concealment of her relationship with Fowler and the fact that he was the obvious suspect in the burglary" and her claim for "the SFSO–issued Service Firearm and radio, which she knew were not her property." The ALJ quoted the judge's comment that " '[o]ne cannot separate her job in law enforcement from her conduct.' " CalPERS's Board of Administration adopted the proposed decision.

Myres petitioned the trial court for a writ of administrative mandamus (Code Civ. Proc., § 1094.5) directing CalPERS to set aside its decision. The court denied her petition, issuing without change a statement of decision drafted by CalPERS's counsel, which reasoned that the convictions arose out

7

of Myres's performance of her official duties because (1) she "falsely claimed that her personal firearm and radio were burgled even though that property belonged to her employer," (2) she "misrepresented the identity of her supervisor and used her employer's fax coversheet to further the fraud," and (3) her "boyfriend (an inmate she met on the job . . . and concealed from her employer and the insurer) . . . put the train of events in motion . . . [by] commit[ing] the burglary." The order concludes that Myres's "misuse of the resources of her public employer and other conduct sufficiently *arose out of her employment* to support [CalPERS]'s forfeiture determination." (Italics added; cf. § 7522.77(b)(1) [requiring that conviction "*aris[e] out of or in the performance of . . . official duties*"], italics added.)

## DISCUSSION

### I.

### *Nature and Standards of Review*

The administrative mandamus statute authorizes judicial review of administrative decisions. (Code Civ. Proc., § 1094.5; see *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 (*Topanga*).) A court may reverse a decision that entails a "prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) An agency abuses its discretion if, among other things, its decision "is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

Our Supreme Court discussed the relationship between those grounds in *Topanga, supra,* 11 Cal.3d at pages 514–516. By requiring trial courts to assess both whether the evidence supports an agency's findings and whether its findings support its decision, the administrative mandate statute implicitly requires an agency to "set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Id.* at pp. 514–

8

515.) The Legislature thus directed courts' attention "to the analytic route the administrative agency traveled from evidence to action." (*Id.* at p. 515.)

Myres's primary argument is that the trial court's factual findings do not legally suffice to support a decision that her convictions were "for conduct arising out of or in the performance of . . . her official duties" (§ 7522.72(b)(1)). Whether the conduct the court found to underlie Myres's convictions lies within the scope of section 7522.72(b)(1) is a question of statutory interpretation that we review de novo. (*Paratransit Inc. v. Unemployment Ins. Appeals Bd.* (2014) 59 Cal.4th 551, 562 (*Paratransit*).)[3]

CalPERS notes that, while the interpretation of section 7522.72(b)(1) is a question of law, we must give "great weight" to the interpretation it offers, as an agency charged with administering the statute.[4] (*Estrada, supra,*

---

[3] Myres makes a fallback argument that the findings do not rest on substantial evidence. If an administrative mandamus appeal requires us to review factual findings, we always apply a substantial evidence test; the variable is to *whose* findings—the agency's or trial court's—we apply that test, and the answer turns on the right at stake. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824.) The parties agree Myres's pension rights are vested, and the trial court thus had to apply its independent judgment to decide if the weight of the evidence in the administrative record supported CalPERS's factual findings (rather than just accepting the findings if supported by substantial evidence), while we in turn would review, if needed, whether substantial evidence supports the *court's* findings, not CalPERS's. (*Estrada v. Public Employees' Retirement System* (2023) 95 Cal.App.5th 870, 881 (*Estrada*).) But because the court's findings are legally insufficient to support the decision, we need not assess whether substantial evidence supports them.

[4] CalPERS is not the only agency charged with doing so. As to counties that run their own retirement systems under the County Employees Retirement Law of 1937 (§ 31450 et seq. (CERL); see, e.g., *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1052–1056 (*Alameda County*); *Hipsher v. Los Angeles County Employees Retirement Assn.* (2020) 58 Cal.App.5th 671, 695 (*Hipsher*)), the Second District held that either the county or county employees retirement

9

95 Cal.App.5th at p. 881.) The rationale for such deference is that CalPERS " ' "has expertise and technical knowledge as well as ' " 'an intimate knowledge of the problems dealt with in the statute and the various administrative consequences arising from particular interpretations.' " ' " ' " (*Id.* at p. 882.) While respecting that principle, we note that its justification is at its nadir in cases like this involving an issue—whether a conviction does or does not "aris[e] out of or in the performance of . . . [a public employee's] official duties" (§ 7522.72(b)(1))—having little to do with the administration of a pension system, and involving instead an analysis of the elements of a criminal statute and their application to a set of facts. Deciding whether section 7522.72 applies to a given criminal conviction is not an analytic exercise in which CalPERS has greater institutional expertise than a court.

It is settled that we may " 'disregard the superior court's conclusions when the probative facts are undisputed and clearly require different conclusions. " 'Appellate review in such a case is based not upon the substantial evidence rule, but upon the independent judgment rule.' " ' " (*Land v. California Unemployment Ins. Appeals Bd.* (2020) 54 Cal.App.5th 127, 138–140, quoting *Paratransit, supra,* 59 Cal.4th at p. 562, and citing *Moustafa v. Board of Registered Nursing* (2018) 29 Cal.App.5th 1119, 1129

association must administer section 7522.72; that PEPRA is ambiguous as to which must do so; and that the better answer is the association. (*Hipsher*, at pp. 703–706.) San Francisco is not a CERL county; CalPERS administers its retirement system.

[because underlying conduct giving rise to convictions was undisputed, whether convictions could support disciplinary action was question of law].)

## II.

### *Text and History of Section 7522.72*

We must determine the scope, or at least the applicability to these facts, of section 7522.72(b)(1), which imposes a forfeiture of pension rights on a public employee "convicted . . . of any felony . . . for conduct arising out of or in the performance of [their] official duties." The employee forfeits only that portion of their pension attributable to the portion of their service during which they engaged in the felonious conduct. (§ 7522.72, subd. (c)(1).)

The Legislature enacted section 7522.72 in 2012 as one of the many parts of PEPRA, an omnibus reform act. While assessing a constitutional challenge to another part of the act, our Supreme Court summarized its history: "The Legislature viewed PEPRA as a 'comprehensive' reform of California's public pension systems. [Citation.] Many of PEPRA's provisions were based on a reform proposal published by [Governor Brown in 2011]. [Fn. omitted.] Its centerpiece was a new pension plan applicable only to newly hired public employees . . . . [Citation.] But PEPRA also modified some statutes governing the pensions of existing employees [citation] and incorporated provisions from separately pending legislation . . . ." (*Alameda County*, *supra*, 9 Cal.5th at p. 1059.)

Given PEPRA's breadth, it is unsurprising that its legislative history fails to detail the purpose or intended scope of the relatively narrow provision at issue here. As our colleagues in Division Two noted, in a thorough opinion rejecting constitutional challenges to section 7522.72, an "examination of the legislative history found nothing providing an express motivation for the forfeiture provision. There are references to 'abusive practices,' which are invariably [identified] as 'pension spiking' and 'double-dipping,' but we found

11

no express intent behind section 7522.72." (*Wilmot v. Contra Costa County Employees' Retirement Assn.* (2021) 60 Cal.App.5th 631, 661 (*Wilmot*).)

Our review of legislative history was to similar effect—except for one relevant passage in a document on which our Supreme Court has relied to construe PEPRA: the Governor's Twelve Point Pension Reform Plan.  (See *Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965, 975 ["nothing in the legislative history explains the Legislature's decision" to enact a provision of PEPRA, but its "likely intent . . . can be inferred from [Gov. Brown's] 12-point plan for pension reform that formed the foundation for PEPRA"].)  Point 7, "Felons Forfeit Pension Benefits," noted "examples of public officials *committing crimes in the course of their public duties*" and declared, "My plan will require that public officials and employees forfeit pension and related benefits if they are *convicted of a felony in carrying out official duties*."[5]  Two committee reports on PEPRA quote Point 7, which section 7522.72(b)(1) tracks by applying to a conviction "for conduct arising out of or in the performance of . . . official duties." (Assem. Conf. Com. Prop. Rpt., Assem. Floor Analysis on Assem. Bill No. 340 (2011–2012 Reg. Sess.) as amended Sept. 7, 2011 ["a felony in carrying out official duties"]; Sen. Rules Com., Off. of Sen. Floor Analyses, Prop Conf. Rpt. No. 1, Aug. 20, 2012 [same].)

We also consider a relevant neighboring statute the parties ignore: section 7522.70.  First enacted in 2005, and renumbered by PEPRA, it targets elected public *officials*.  (§ 7522.70, added by Stats. 2005, ch. 322, § 1, renumbered and amended by Stats. 2012, ch. 296, § 9.)  It imposes a more

---

[5] Gov. Edmund G. Brown, Jr., Twelve Point Pension Reform Plan, Oct. 27, 2011, p. 4 <https://www.gov.ca.gov/wp-content/uploads/2017/09/Twelve_Point_Pension_Reform_10.27.11.pdf> [as of Dec. 26, 2025], italics added (12-Point Plan).

thorough forfeiture than section 7522.72, but its scope is narrower. Under section 7522.70, an elected official "forfeit[s] all rights and benefits under, and membership in, any public retirement system" upon conviction of "any felony involving accepting or giving, or offering to give, any bribe, the embezzlement of public money, extortion or theft of public money, perjury, or conspiracy to commit any of those crimes *arising directly out of his or her official duties* as an elected public officer." (*Ibid.*, italics added.)

## III.

### *Analysis*

#### A. Section 7522.72 Focuses on "Official Duties"

The 12-Point Plan's targeting of public employees "convicted of a felony in carrying out official duties" supports a relatively narrow reading of section 7522.72(b)(1) as focused on felonies committed in carrying out such duties. But the Legislature did broaden the Governor's language somewhat: from "convicted of a felony *in carrying out* official duties" (12-Point Plan, p. 4, italics added) to "convicted . . . of any felony . . . for conduct *arising out of or in the performance of* [their] official duties" (§ 7522.72(b)(1), italics added). And comparison with section 7522.70 shows the Legislature did not intend section 7522.72 to require the tightest possible nexus between the conduct that led to an employee's conviction and their performance of official duties. Section 7522.70 applies to conduct "arising *directly* out of [one's] official duties as an elected public officer" (italics added), but section 7522.72(b)(1) applies to conduct "arising out of or in the performance of . . . official duties."

If we step back and consider section 7522.72(b)(1) in light of *both* its predecessors—the 12-Point Plan and section 7522.70—we see a steady focus on officers' or employees' "official duties." The provisions require felonious conduct "in carrying out official duties" (12-Point Plan, p. 4), "arising directly

13

out of [an elected officer's] official duties" (§ 7522.70), or "arising out of or in the performance of [a public employee's] official duties" (§ 7522.72(b)(1)). The need to center our analysis on the question of "official duties" is thus clear.

## B. This Is an Unsuitable Case in Which to Craft a Comprehensive Analysis of Section 7522.72(b)(1)

Given the text of section 7522.72, it is surprising that CalPERS does not identify any specific "official duties" out of which, or in the performance of which, Myres's criminal conduct "ar[ose]." Instead, it urges us to replace the statutory language with a judge-made rule that a public employee's criminal conduct need only be "job-related." More surprisingly, CalPERS claims that two opinions rejecting *constitutional* challenges to section 7522.72—*Wilmot, supra*, 60 Cal.App.5th 631, and *Hipsher, supra*, 58 Cal.App.5th 671— constitute authority for such a rule.

Contrary to CalPERS's assertion, neither *Wilmot* nor *Hipsher*—nor any published opinion[6]—has "interpreted and applied the reach of [section 7522.72(b)(1)]." In each of those cases, the court of appeal considered only *constitutional* challenges to the application of section 7522.72 to a former public employee, as well as unrelated questions of statutory construction— *not* arguments about whether the conduct for which the employee had been convicted qualified as "arising out of or in the performance of his or her official duties" (§ 7522.72(b)(1)).

In *Hipsher*, the Second District could not have made more plain that limitation on the scope of its analysis. The opinion began by summarizing its holdings: applying section 7522.72 to employees hired before it took effect did

---

[6] Cf. *Estrada, supra*, 95 Cal.App.5th at pp. 876–877, 881 [employee conceded that conduct underlying no contest plea to felony charge fell within scope of § 7522.72(b)(1), while arguing that statute did not apply because she received misdemeanor sentence and had charge dismissed after probation].)

14

not violate the contracts clause of the state Constitution; the statute is not an unconstitutional ex post facto law; and a former employee facing forfeiture "is entitled to appropriate administrative due process."[7] (*Hipsher, supra*, 58 Cal.App.5th at p. 683.) The court remanded "with instructions for [the agency] to provide Hipsher appropriate notice of its intent and the reasons for its initiation of forfeiture proceedings, and an opportunity to present his objection to [an] impartial decision maker, *whether he falls within the scope of section 7522.72.*" (*Ibid.*, italics added.) To avert any possible confusion, the court added this footnote: "*The question whether Hipsher's criminal conduct was job-related remains unresolved.* Our focus is on the constitutionality of section 7522.72. In assuming as a threshold matter that [the] provision of section 7522.72 correctly applies to Hipsher's case, *we take no position on whether his criminal conduct 'ar[ose] out of or in the performance of his . . . official duties.'* (§ 7522.72[(b)(1)].) . . . [I]t remains [the agency]'s obligation to establish, in accordance with . . . due process, that Hipsher's criminal conduct was indeed job-related." (*Id.* at p. 686, fn. 6, italics added.)

While the opinion in *Wilmot, supra*, 60 Cal.App.5th 631, lacks a similar express disclaimer, it too leaves no doubt that the court addressed only constitutional challenges to section 7522.72—and a statutory interpretation question about whether it applied to Wilmot given his retirement's *timing*. (*Id.* at p. 641.) The court never addressed whether his conduct "ar[ose] out of

---

[7] The court also answered a mixed statutory/constitutional question as to the *procedure* to use in applying section 7522.72. (*Hipsher, supra*, 58 Cal.App.5th at p. 703.) The question involved not the scope of the "arising out of . . ." standard (§ 7522.72(b)(1)) but the statute's ambiguity, with regard to a CERL county (see fn. 4, *ante*), "as to which agency is tasked with determining whether [an] offense is job-related" and affording due process to a former employee facing forfeiture—the County or the County Employees Retirement Association. (*Hipsher* at p. 703, capitalization omitted).

or in the performance of his . . . official duties" (§ 7522.72(b)(1).  While *Wilmot* does not say that Wilmot *conceded* the point, he did not dispute it on appeal.[8]

"It is axiomatic that cases are not authority for propositions that are not considered." (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043.)  That axiom is long settled.  (See, e.g., *Oakland Paving Co. v. Whittell Realty Co.* (1921) 185 Cal. 113, 119–120.)  To justify its claims, CalPERS notes that *Hipsher* and *Wilmot* "repeatedly described the required showing as being only that felonious conduct was 'job-related.' " (Citing *Hipsher, supra,* 58 Cal.App.5th at pp. 685, 690, 693–699 and *Wilmot, supra,* 60 Cal.App.5th at pp. 650, 656, 663, 669, 671.)  True:  in discussing the constitutional claims and unrelated statutory issues raised in those appeals, each court repeatedly used the phrases "job-related crime" or "job-related felony" as a shorthand way of referring to "felony . . . for conduct arising out of or in the performance of [a public employee's] official duties"

_____

[8] Wilmot had been convicted of embezzlement (Pen. Code, §§ 503, 508) because, "for a considerable part of his tenure," he had stolen "property and equipment" from his public employer.  (*Wilmot, supra,* 60 Cal.App.5th at p. 643.)  He may thus have decided it would be futile to deny that his conduct "ar[ose] out of or in the performance of his . . . official duties" (§ 7522.72(b)(1)).  In any case, for whatever reason, he did not dispute the point. Instead, in a petition the court described as having "succinctly stated" his position, he pled that applying " 'section 7522.72 to [him] is improper because the statute does not apply retroactively to persons . . . who retired prior to its effective date.  Moreover, even if . . . section 7522.72 was intended to apply [to such persons], [it] cannot lawfully do so because . . . the Legislature cannot lawfully alter an existing retiree's pension benefit once [it] came due and payable.  The Legislature also lacks authority to enhance the punishment for past conduct by enacting an ex post facto law. . . .' " (*Wilmot,* at pp. 644–645.)  The rest of the opinion makes clear those are the only issues the court addressed.  Its Discussion section has two parts:  (1) "Statutory Analysis" (*id.* at pp. 650–655), which begins, "Wilmot asserts . . . but a single legal error, namely, . . . [that] he was retired . . . and therefore beyond the reach of section 7522.72" (*id.* at p. 650), and (2) "Constitutional Analysis" (*id.* at pp. 655–673).

(§ 7522.72(b)(1)).[9] But neither court suggested—even in dicta—that it had analyzed the statutory language "for conduct arising out of or in the performance of . . . official duties" and concluded that it sets a standard under which a conviction triggers section 7522.72 so long as it is "job-related." Instead, their opinions make clear that they simply wished to avoid having to refer repeatedly—26 times, in *Hipsher*—to a "conduct-arising-out-of-or-in-the-performance-of-his-official-duties-based felony."

CalPERS made the same argument about the scope of the statutory language to the ALJ, who explained clearly why its interpretation is incorrect: "The [*Hipsher*] court used the term 'job-related' 26 times in place of the statutory language 'for conduct arising out of or in the performance of his

---

[9] See, e.g., *Hipsher*, 58 Cal.App.5th at pp. 694–695 [rejecting claim "that section 7522.72 may only be sustained under the contract clause if it provides a corresponding new advantage to offset the partial forfeiture of pension benefits. . . . '[I]t would be anomalous to suggest that the Legislature must reward an employee for conviction of a *job-related felony* by providing a new comparable advantage . . . .' "], italics added; *id.* at pp. 698–699 [noting, in analyzing whether section 7522.72 is so punitive as to trigger ex post facto clause, that its sanction "is not excessive in relation to" its stated nonpunitive purpose, as forfeiture "is limited to the period during which the pensioner committed the *job-related felony*"], italics added; *id.* at p. 700 [starting due process analysis by stating, "A public employee who commits a *job-related felony* 'shall forfeit' [certain benefits] . . . . [Citation.] However, section 7522.72 does not provide a mechanism for the pensioner to challenge an adverse decision. . . . [W]e must decide what procedures are required to satisfy due process."], italics added; *Wilmot*, *supra*, 60 Cal.App.5th at p. 650 [noting as background that, "As pension forfeiture provisions go, California's is rather temperate. [Citations.] It is not triggered by just any conviction, or even any felony conviction, but only a felony conviction that is *job-related*"], italics added; *id.* at pp. 670–671 [to assess ex post facto claim, "we 'consider whether the proceedings are so punitive in fact as to "persuade us that the forfeiture proceeding[s] may not legitimately be viewed as civil in nature," despite [the Legislature's] intent.' [Citation.] This too is not difficult. . . . [S]ection 7522.72 is not draconian. It does not call for the loss of all pension benefits. It is triggered only by felonies that are *job-related*"], italics added.)

17

or her official duties, in pursuit of the office or appointment, or in connection with obtaining salary, disability retirement, service retirement, or other benefits.' CalPERS argues that this shows that the statutory language should be read broadly to mean that [Myres]'s convictions merely had to be 'related to' her employment to trigger forfeiture under section 7522.72. However, the court was not considering the scope of 'arising' and its use of the shorthand term 'job related' is only mildly persuasive that the terms are synonymous for this purpose."

We agree with the thrust of that analysis. We cannot agree, however, that the *Hipsher* court's use of the "job-related" shorthand is "mildly" or in any way "persuasive" evidence that the statutory text "arising out of or in the performance of . . . official duties" (§ 7522.77(b)(1)) means only "job-related." The court's use of that shorthand, in discussing legally distinct issues, says nothing about the proper scope of the actual statutory language. Had the *Hipsher* court meant to become the first in the state to construe the scope of section 7522.72(b)(1), it would have conveyed its ruling with far more care.[10]

---

[10] We note by analogy our Supreme Court's rejection of a similarly misguided argument in *People v. Jimenez* (2020) 9 Cal.5th 53. *Jimenez* held that the offense defined by Penal Code section 530.5, subdivision (a)— " 'willfully obtain[ing] personal identifying information' . . . of another person, and 'us[ing] that information for any unlawful purpose,' " widely known by the shorthand "identity theft"—is not a "theft" offense for purposes of Proposition 47, requiring the reclassification of some " 'burglary or theft' offenses" as misdemeanors. (*Jimenez*, at p. 58.) "[U]se of the shorthand 'identity theft' to describe the offense in section 530.5 doesn't somehow make the misuse of personal identifying information swallow up elements of the theft offense, nor does it otherwise 'provide a reason to read into the statute an additional element that cannot be found by referring to the language of the statute.' " (*Jimenez*, at p. 71.) The same is true here.

While firmly rejecting CalPERS's view, nor can we agree with Myres that the statute applies only if a public employee's crime "*directly* resulted from the *corrupt performance* of her official duties." (Some italics added and omitted.) We cannot read the word "directly" into section 7522.72 when the Legislature omitted it from that section after having used it in its neighbor, section 7522.70, which applies to an elected officer convicted of "any felony involving [specified types of] crimes arising *directly* out of his or her official duties" (§ 7522.70, italics added). (See *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 [if Legislature " 'has carefully employed a term in one place and has excluded it in another, it should not be [inferred] where excluded' "].) Nor can we hold that a conviction must have "resulted from the corrupt performance of . . . official duties," as that would make half the provision's text surplusage, which we must avoid. (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1135.) A conviction resulting from *corrupt performance* of official duties would be for conduct in the performance of those duties, yet the statute applies to convictions "for conduct *arising out of or* in the performance of . . . official duties" (§ 7522.72(b)(1), italics added). The phrase "arising out of . . . the performance of . . . official duties" must capture some swath of conduct broader than that encompassed by "in the performance of official duties."

That said, we agree with Myres that the statute requires some causal nexus between an employee's official duties and the conduct for which they were convicted. Insofar as the requisite tightness of that nexus is debatable, two principles lead us to err on the side of strictness: (1) we must construe "ambiguous or uncertain" laws governing public employee pensions "liberally in favor of the pensioner" (*Hale v. Public Employees' Retirement System* (2022) 82 Cal.App.5th 764, 772 (*Hale*)); and (2) we must construe ambiguous

19

statutes so as to avoid raising constitutional questions (*People v. Buza* (2018) 4 Cal.5th 658, 682 (*Buza*)). A broad reading of section 7522.72(b)(1) could raise such questions, for the constitutionality of section 7522.72 under the contracts and ex post facto clauses of our state constitution depends in no small part on its "temperate and narrowly tailored scope" (*Hipsher, supra,* 58 Cal.App.5th at p. 693; accord, *Wilmot, supra,* 60 Cal.App.5th at pp. 670–671).

The exact scope of the "arising out of or in the performance of . . . official duties" requirement will thus have to await definition via case-by-case adjudication—or by a rule set forth in a future case. For now, we conclude for the reasons set forth below that, while the facts of this case present a close call, they fall outside the statute's scope.

**C. Myres's Criminal Conduct Did Not Arise Out of Or In the Performance of Her Official Duties.**

Below, we first discuss the federal court's comments in sentencing Myres and then the conduct on which CalPERS and the trial court relied.

***The Federal District Court's Ruling Supports Myres***

As noted, the court declined to adjust Myres's sentence under a federal guideline applicable to defendants who "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." (U.S.S.G. § 3B1.3.) Deeming it a "close call," the court ruled that the "crimes for which [she] was actually convicted"— setting aside the misprision of felony charge based on the theory that she and Fowler had staged the burglary—"did not involve an abuse of a position of trust that significantly facilitated the offense." We need not parse the distinction between a position of trust "significantly facilitat[ing]" a crime, on one hand, and a crime involving conduct "arising out of or in the performance of . . . official duties" (§ 7522.72(b)(1)), on the other; suffice it to say that the

20

provisions clearly are conceptual cousins of some degree, and the federal court's ruling bolsters Myres's position here.

CalPERS implicitly concedes as much: Rather than meaningfully dispute that the adjustment ruling supports Myres, it counters that *other* comments by the sentencing judge support *its* position. CalPERS notes the comments that Myres "abused her trust as a sworn law enforcement officer[,] which makes it a different case"; that one " 'cannot separate her job in law enforcement from her conduct,' " as she "was trusted by the [SFSO] and by her community, . . . which she had taken an oath to protect"; and that her career was not a mitigating factor because, "with a successful career as a Sheriff's Deputy[, she] should have known better," and "[w]hen those sworn to uphold the law become the very ones who break the law, the entire criminal justice system is undermined."

CalPERS misreads those comments. They convey the judge's beliefs that Myres's career should not *mitigate* her sentence; that it is especially wrongful for law enforcement officers to break the law, as they have sworn a contrary oath; and that courts must sternly sentence those who nonetheless do so. While those points justify a refusal to reduce Myres's sentence, they have nothing to do with whether her criminal conduct arose out of or in the performance of her official duties. They concern her *status* as a law enforcement officer, not a link between the specific *conduct* for which she was convicted and her position of trust. By stating that one cannot "separate her job in law enforcement from her conduct," the court meant that one cannot treat her career as a mitigating factor without simultaneously considering how, during that career, she chose to engage in criminal conduct. That has nothing to do with whether the conduct arose out of her official duties.

The federal court further made clear that its concern was not a nexus between Myres's conduct and her official duties at another point, when Myres's counsel tried to address the "abuse [of] trust" comment  To defuse that idea, counsel criticized the presentence report's references to Myres having (1) hugged an SFPD officer she knew when he responded to her burglary call; (2) used the SFSO fax, and (3) worn her uniform to a post-work interview with Farmers.  Asked why he was addressing such facts, counsel replied, "The Court said there was an abuse of trust," and the court then clarified what it had meant:  "It's not . . . Well, okay, she wore her uniform on X day, so let's talk about the uniform wearing.  *It is much more macro than that to me.*"  (Italics added.) The court's concern, in other words, was not whether specific acts by Myres did or did not arise out of or entail an abuse of the trappings of her position, but the "macro" point that, when she committed her crimes, she was a sworn law enforcement officer.

Read in context, the court's comments would thus apply equally to any law enforcement officer convicted of any crime for any conduct.  But section 7522.72 imposes its harsh sanction on only a subset of public employees convicted of crimes—those convicted for conduct arising out of or in the performance of official duties.  To the extent the court touched on *that* issue—by rejecting a position-of-trust adjustment—its analysis bolsters Myres's view.  Its comments about her *status* as a law enforcement officer do not support CalPERS's view of the conduct-based statute at issue here.

### *The Conduct CalPERS Notes Does Not Satisfy the Statute*

CalPERS lists five aspects of Myres's conduct assertedly "arising out of or in the performance of . . . her official duties" (§ 7522.72(b)(1)): her pursuit of an "illicit relationship" with Fowler, as enabled by her position; "dissembling to [Farmers] about the existence of a disgruntled ex-boyfriend" in order to deny SFSO "further proof of that illicit relationship"; "taking steps to conceal

22

Fowler's identity and likely culpability from the FBI"; "lying as to the ownership of the SFSO-issued property"; and "using employer resources (the . . . fax machine and . . . cover sheet) to perpetuate her fraud."

The first three of those proposed bases for applying section 7522.72 fail in limine (i.e., at the threshold), for they are not conduct for which the jury could possibly have found Myres guilty of mail and wire fraud. Those crimes' elements were (1) devising a scheme to defraud or obtain money via fraudulent pretenses or representations that (2) were material (meaning, tending or able to influence someone to part with money) and (3) made with intent to defraud (4) by mail or wire. None of the first three types of conduct—having a relationship with Fowler, concealing his existence from Farmers to further her effort to deceive SFSO, and not disclosing his likely role to the FBI—could form part of any of those elements, for none of that conduct furthered a scheme *to obtain money from Farmers*.

Myres's relationship with Fowler was, as to her crimes, mere background: It violated SFSO policy, but as the federal court instructed her jury, violation of such a policy "is not a federal crime," and "none of the charges in this case charge [Myres] with violating any of these policies." The indictment charged Myres with "executing a scheme and artifice to defraud Farmers," not the SFSO or the FBI. At sentencing, the court did not sustain the government's objection to the presentence report's failure to list SFSO as a victim. Insofar as Myres dissembled to Farmers about Fowler *to further her attempts to deceive SFSO*, her conduct was not part of a fraudulent scheme to obtain money *from Farmers*. Any concealment from the FBI is irrelevant for the same reason.

CalPERS notes that Fowler's likely role in the burglary was material to Farmers's attempts to investigate and conceivably aid recovery of the stolen

23

items, and that it asked Myres questions—e.g., if she had any "begrudged ex-boyfriends"—meant to elicit such information. Farmers did have a material interest in information about Fowler; there was strong evidence Myres deceptively withheld the information; and disclosure could in theory have contributed to recovery of some of her items (for which Farmers would thus not have potentially had to pay her). Nonetheless, it was not logically possible for Myres's deception of Farmers on that issue to further a scheme to defraud Farmers of money to which she was not entitled.

That is because, as to the stolen items, Myres's and Farmers's interests in their recovery were aligned: She wanted her items back, and Farmers wanted to avoid having to reimburse her for them. As Myres noted at sentencing, in a point the prosecution did not dispute, Farmers would have had to reimburse her for the items even had she disclosed her relationship with Fowler and the reasons to suspect him. Myres's deceptions as to Fowler were thus material only to her scheme to keep her job, not her scheme to get money from Farmers. It was only for the latter scheme that she was convicted.

In an attempt to elide that point, CalPERS asserts—without citing authority—that the "felonies of which [Myres] was convicted included the element of a 'scheme' to defraud; therefore, any action she took, that the jury considered, and any lie she told, that the jury heard, became part of the jury verdict." This "every lie she told" theory, unmoored from any legal authority or standard, is unpersuasive. Section 7522.72 applies to one convicted of a felony "for [specified] conduct . . . ." (§ 7522.72(b)(1)). Absent a reasoned contrary argument based on precedent or legislative history, we find it self-evident that a person can have been convicted of a felony "for [specified]

24

conduct" only if that conduct satisfied, at least in part, an element of the felony.  Myres's deceptive conduct regarding Fowler did not.

Given the elements of Myres's crimes, as stated in the jury instructions, CalPERS's theory must be that, to establish the first element of "a scheme or plan to defraud **or** a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" (italics and boldface added), the prosecution could prove *either* a scheme to fraudulently "obtain[] money or property" from Farmers *or* a scheme to "defraud" Farmers in any way, for any purpose.  The "every lie she told" theory must rest on the idea that "to defraud" means to tell any lie or deceitful half-truth for any reason, such as a desire to obscure Fowler's role in order to conceal her relationship with him *from SFSO*.  We disagree.

While the parties have not briefed how to construe the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343), our research indicates that the United States Supreme Court rejected CalPERS's view in *McNally v. United States* (1987) 483 U.S. 350, 358–360 (*McNally*), overruled in part by statute as explained in *Cleveland v. United States* (2000) 531 U.S. 12, 20.)  "Because the two phrases identifying the proscribed schemes appear in the disjunctive," the Court acknowledged, "it is arguable that they are to be construed independently and that the money-or-property requirement of the latter phrase does not limit schemes to defraud to those aimed at causing deprivation of money or property." (*Id.* at p. 358.)  But "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick,

25

deceit, chicane or overreaching.' " (*Ibid.*) The Court thus "read § 1341 as limited in scope to the protection of property rights." (*Id.* at p. 360.)[11]

The instructions given to Myres's jury reflect this view. Their first element echoed the statute, listing the proscribed schemes in the disjunctive: "a scheme or plan to defraud *or* . . . for obtaining money or property by [fraudulent] pretenses, representations, or promises." (Italics added.) But the second element, requiring that "the statements made as part of the scheme [be] material," defined "material" as "[having] a natural tendency to influence or [being] capable of influencing a person to part with money or property." The jury thus could have found Myres guilty of fraud based only on statements tending to influence "a person to part with money or property."

We presume that the jury followed its instructions. (*Penry v. Johnson* (2001) 532 U.S. 782, 799.) That presumption leads to the same conclusion as a commonsense review of the indictment and trial transcript: the conduct for which Myres was convicted was scheming to defraud Farmers of money, not to defraud SFSO or the FBI about her relationship with Fowler. CalPERS

---

[11] *McNally* rejected a theory that the statute applied to a state official's use of the mail to further a scheme to deprive his state's citizens of their intangible right to have the state's affairs conducted honestly, which he did by directing commissions on payments made by an agency he oversaw to a business he secretly owned. (*McNally*, *supra*, 483 U.S. at pp. 352–353, 360.) After holding that the statute must be read "as limited in scope to the protection of property rights," the Court added, "If Congress desires to go further, it must speak more clearly." (*Ibid*.) Congress then did so, amending the statute "specifically to cover . . . 'the intangible right of honest services.' " (*Cleveland v. United States*, *supra*, 531 U.S. at p. 20, quoting Anti–Drug Abuse Act of 1988, § 7603(a), 18 U.S.C. § 1346.) In so doing, Congress did not *eliminate* the money-or-property requirement, but created a narrow exception irrelevant here. (See *Cleveland*, at p. 20 [amendment "covered only the intangible right of honest services"].) CalPERS does not contend, and the transcript does not suggest, Myres was convicted on an honest services theory.

cannot treat her as having been convicted for conduct—deceitful statements, half-truths, and omissions about Fowler—that served only the latter purpose.

The other acts on which CalPERS relies—Myres's lies about owning her SFSO gun and radio (and, relatedly, about her direct supervisor), as well as her use of SFSO fax resources—are among those for which her jury could have found her guilty. But even assuming the jury did rely on that conduct, CalPERS fails to show it arose out of or in the performance of official duties.

We first consider Myres's lies about having personally purchased her SFSO-issued gun and radio, and her subsidiary lies about the identity of her direct supervisor (whom Farmers could have contacted about her ownership claim). While that conduct plainly related to Myres's public employment, CalPERS has not identified, and we cannot discern, any way in which it arose out of or in the performance of her official duties. In submitting an insurance claim for the burglary of her home, she engaged in a personal business transaction unrelated to her official duties; she of course had no duty as a deputy sheriff to file an insurance claim about her home. The fact that the property of which she falsely claimed ownership was issued to her for use in performing her official duties does not mean that filing the insurance claim in some way arose out of her performance of those duties—any more than if, while off duty at home, she had for personal reasons used her service weapon to shoot someone. Similarly, while her direct supervisor obviously *oversaw* her official duties, Myres was not called upon to identify that person in performance of any such duty, or in any way arguably relating to or arising from those duties. She did so as part of a private contractual relationship with Farmers, to further a claim for compensation involving her home.

The same is true of Myres's use of SFSO fax resources. CalPERS does not identify an official duty out of which the use arose. Myres had no official

27

duty to send Farmers the fax; it did not further or arise out of the performance of one; and neither the federal prosecutors nor CalPERS has even alleged she sent the fax while on duty. While the fax falsely identified her direct supervisor—i.e., the person who *oversaw* performance of her duties—the purpose of that identification was to further a private transaction, not to facilitate the performance of an official duty.

That said, it is of course unethical for a public employee to use public resources for personal business (even if, as here, the usage is de minimis). The idea that the state should sanction a public employee who uses such resources not just for personal business, but for personal *crimes*, has intuitive appeal. But the extreme sanction imposed by section 7522.72—a forfeiture of vested pension rights—implicates constitutional rights that must give us pause before we let such an ethical intuition lead us to construe the statute indiscriminately. (See *Hipsher*, *supra*, 58 Cal.App.5th at p. 693 [finding law constitutional based in part on its "narrowly tailored scope"]; *Wilmot*, *supra*, 60 Cal.App.5th at pp. 670–671 [same]; *Buza*, *supra*, 4 Cal.5th at p. 682 [courts must construe ambiguous statutes to avoid raising constitutional questions]). Section 7522.72 imposes its severe sanction on public employees convicted not of felonies "for conduct [involving use] of . . . official [resources]," but of felonies "for conduct arising out of or in the performance of . . . official duties" (§ 7522.77(b)(1)). Myres's conduct did not so arise.

The facts here differ instructively from those in *Hipsher*, *supra*, 58 Cal.App.5th 671, in which the court remanded for a determination whether a firefighter's felonious conduct—running a gambling platform— arose out of or in the performance of his official duties. (*Id.* at p. 683.) Prosecutors had alleged that, for years, Hipsher "[ran] the illegal gambling enterprise out of his [public] office while performing his official duties, using

28

resources of his public employer." (*Id.* at p. 685.) If those allegations were true, Hipsher diverted copious public resources—his time, attention, and energy, at times when his public employer was paying for those resources—to criminal activity. While we, like the *Hipsher* court, "take no position on whether his criminal conduct 'ar[ose] out of or in the performance of his . . . official duties' " (*id.* at p. 686, fn. 6, quoting § 7522.72, subd. (b)(1)), it is fair to say that (1) the facts of *Hipsher* provide a debatable basis for applying section 7522.72, and (2) the facts of this case qualitatively differ. Myres is alleged to have committed but one act contributing to her conviction—sending a single fax—in a way that used a slight amount of public resources, without diverting her on-duty efforts, attention, and energy to criminal conduct.

If a public employee diverts time and energy from the official duties their employer is paying them to perform into private criminal conduct, it is intuitively appealing to read section 7522.77(b)(1) expansively and treat the conduct, without further inquiry, as "arising out of or in the performance of [their] official duties." That said, the Legislature could have drafted the statute to cover conduct "arising out of or in the performance of . . . official duties *or involving the use of public resources*," but did not. However such arguments are ultimately resolved—which we need not decide—they are not implicated by Myres's single, off-duty, de minimis use of public resources.

By using the cover sheet, CalPERS further argues, Myres devoted not just tangible but intangible public resources—the authority and prestige of the Sheriff's Office—to her crime. If true, that would be an even more intuitively compelling reason to stretch the text of section 7522.72(b)(1) to encompass her conduct. But no evidence supports CalPERS's speculation. While admitting her use of the cover sheet, Myres denies that her intent was to exploit the SFSO's authority to help defraud Farmers. Indeed, the cover

29

sheet could not have bolstered her credibility with Farmers, she contends, for Farmers already knew she was a Deputy Sheriff—a fact that neither her prosecutors nor CalPERS has disputed. There is no evidence that Myres tried to use the SFSO's credibility to further her crimes—let alone that her jury found that she did so and based her convictions on such conduct.

In sum, we construe all ambiguous statutes governing public pensions in favor of pensioners (*Hale*, *supra*, 82 Cal.App.5th at p. 772) and must narrowly construe section 7522.72(b)(1), in particular, to avoid raising constitutional questions (*Buza*, *supra*, 4 Cal.5th at p. 682). In the face of those interpretive headwinds, CalPERS offers no reason to apply a law governing conduct "arising out of or in the performance of . . . official duties" to conduct entailing a single off-duty use of official *resources* unrelated to such duties. Absent clearer direction from the Legislature or our Supreme Court, we cannot so construe section 7522.72.

## DISPOSITION

The judgment is reversed. Myres shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

_____

Langhorne Wilson, J.


WE CONCUR:


_____

Humes, P. J.


_____

Smiley, J.


A170516

## Myres v. Board of Administration For Public Employees Retirement System (A170516)

Trial Court:       City and County of San Francisco

Trial Judge:      Hon. Richard B. Ulmer

Attorneys:

      King & Spalding, Michael J. Shepard, Matthew Vincent Hamilto Noller for Plaintiff and Appellant.

      Rob Bonta, Attorney General of California, Carl Wintch Sonne, Senior Assistant Attorney General, Joshua Anthony Room, Supervising Deputy Attorney General, Christopher Michael Young, Deputy Attorney General for Plaintiff and Respondent.